Brian Willen*
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (212) 999-5800
bwillen@wsgr.com

Lauren Gallo White*
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2158
lwhite@wsgr.com

Deno Himonas (5483)
Elizabeth Sharkey (18655)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
95 South State Street, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401-8510
dhimonas@wsgr.com
esharkey@wsgr.com

Edward Percarpio*
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1700 K Street NW, Fifth Floor
Washington, D.C. 20006
Telephone: (202) 973-8800
epercarpio@wsgr.com

*(*motions for admission*
*pro hac vice pending*)

*Attorneys for Plaintiff Computer & Communications Industry Association*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,<br><br>Plaintiff,<br><br>vs.<br><br>DEREK BROWN, in his official capacity as Attorney General of Utah; KATHERINE HASS, in her official capacity as the Director of the Division of Consumer Protection of the Utah Department of Commerce,<br><br>Defendants. | **MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 2:26-cv-00094-RJS-DAO<br><br>District Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 3

    A.    CCIA Members Create and Facilitate Protected Speech By Operating App Stores and Developing Mobile Apps ...................................................... 3

        1.    Mobile Apps Offer Vast Amounts of Protected Speech and Information ................................................................................. 4

        2.    Mobile App Stores Disseminate Vast Amounts of Protected Speech ...................................................................................... 6

    B.    Existing Protections for Child-Directed Apps, Including Parental Controls .......... 7

    C.    Utah Senate Bill 142 ............................................................................ 8

ARGUMENT ........................................................................................................ 13

I.    CCIA HAS STANDING TO BRING THIS CHALLENGE ........................................... 15

II.    CCIA IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIRST AMENDMENT AND VAGUENESS CLAIMS ............................................................ 17

    A.    S.B. 142's Verification and Consent Requirements Violate the First Amendment ........................................................................................ 17

        1.    App Stores, Developers, and Users Enjoy First Amendment Protections When They Create, Access, and Disseminate Speech ........... 17

        2.    S.B. 142 Burdens These Rights by Restricting Speech at Three Chokepoints ................................................................................ 20

            a)    Chokepoint 1: Age Verification and Parental Tethering at Account Creation ...................................................................... 20

            b)    Chokepoint 2: Parental Consent Required for Each App Download ................................................................................ 23

            c)    Chokepoint 3: Ongoing Parental Consent for In-App Purchases and Significant Changes to App Terms ........................ 24

3.      S.B. 142's Verification and Consent Regime Triggers Strict Scrutiny ...................................................................................26

      a)      The State's Purpose Is to Bar Access to Content...........................26

      b)      S.B. 142 Directly Burdens Fully Protected Speech .......................27

4.      The Verification and Consent Requirements Are Not Narrowly Tailored and Cannot Survive Any Form of Heightened Scrutiny ............29

      a)      The Act's Verification and Consent Regime Is Overinclusive ...............................................................................32

      b)      Existing Parental Controls and Laws Diminish the State's Interest and Further the Act's Tailoring Problem .........................33

      c)      The Act Is Also Woefully Underinclusive....................................35

B.      The Act's Speech Rating Provisions May Unconstitutionally Compel Speech, and Should Be Construed to Avoid That Result ......................37

III.      THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION ................ 40

A.      CCIA and Its Members Will Suffer Irreparable Harm if S.B. 142 Is Not Enjoined ................................................................................40

IV.      THE AGE VERIFICATION, PARENTAL VERIFICATION AND PARENTAL CONSENT PROVISIONS CANNOT BE SEVERED FROM THE REST OF S.B. 142........................................................................................ 43

CONCLUSION.......................................................................................... 44

**TABLE OF AUTHORITIES**

Page(s)

CASES

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023)..................................................................................18, 19, 38

*ACLU v. Gonzales*,
    478 F. Supp. 2d 775 (E.D. Pa. 2007),
    *aff'd*, 534 F.3d 181 (3d Cir. 2008) ....................................................................22

*Aptive Env't., LLC v. Town of Castle Rock*,
    959 F.3d 961 (10th Cir. 2020) ............................................................................39

*Arcara v. Cloud Books, Inc.*,
    478 U.S. 697 (1986)............................................................................................26

*Awad v. Ziriax*,
    670 F. 3d 1111 (10th Cir. 2012) ........................................................................43

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001)............................................................................................18

*Berry By ex rel. Berry v. Beech Aircraft Corp.*,
    717 P.2d 670 (Utah 1985) ..................................................................................43

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ..............................................................................39

*Boos v. Barry*,
    485 U.S. 312 (1988)............................................................................................27

*Brewer v. City of Albuquerque*,
    18 F.4th 1205 (10th Cir. 2021) ..........................................................................30

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973)............................................................................................17

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011)............................................................17, 18, 19, 23, 29,
    30, 31, 32, 33,
    34, 35, 36, 39

*CCIA v. Paxton*,
    2025 WL 3754045 (W.D. Tex. Dec. 23, 2025) (unpublished),
    *appeal filed*, No. 26-50001 (5th Cir. Jan. 2, 2026) ......................2, 3, 14, 15, 27,
    28, 29, 31, 32,33,
    35, 36, 38, 40

*CCIA v. Paxton*,
    747 F. Supp. 3d 1011 (W.D. Tex. 2024)..........................................................32

*CCIA v. Uthmeier*,
    2025 WL 1570007 (N.D. Fla. June 3, 2025) (unpublished) ............................34

*Chamber of Com. of U.S. v. Edmondson*,
    594 F.3d 742 (10th Cir. 2010) .......................................................................41

*Citizens United v. FEC*,
    558 U.S. 310 (2010)......................................................................................20

*City of Austin v. Reagan Nat'l Advertising Of Austin, LLC*,
    596 U.S. 61 (2022)..................................................................................26, 30

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994).......................................................................................36

*Dias v. City & Cnty of Denver*,
    567 F.3d 1169 (10th Cir. 2009) ...................................................................16

*Ent. Software Ass'n v. Blagojevich*,
    469 F.3d 641 (7th Cir. 2006) ........................................................................39

*Ex parte Young*,
    209 U.S. 123 (1908).....................................................................................13

*Free Speech Coal., Inc. ("FSC") v. Paxton*,
    606 U.S. 461 (2025).........................................................20, 26, 28, 29, 33

*Free Speech Coal., Inc. v. Paxton*,
    95 F.4th 263 (5th Cir. 2024) .........................................................................35

*Free the Nipple-Fort Collins v. City of Fort Collins*,
    916 F.3d 792 (10th Cir. 2019) ......................................................................13

*Genusa v. City of Peoria*,
    619 F.2d 1203 (7th Cir. 1980) ......................................................................18

*Harmon v. City of Norman*,
    981 F.3d 1141 (10th Cir. 2020) ....................................................................26

*McCullen v. Coakley*,
    573 U.S. 464 (2014)................................................................................30, 33

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995).....................................................................................21

*Midvale City Corp. v. Haltom*,
    2003 P.3d 334 (Utah 2003) ..........................................................................43

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024)..................................................................5, 19

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964)........................................................................20

*Nat'l Inst. of Fam. & Life Advocs. ("NIFLA") v. Becerra,*
    585 U.S. 755 (2018)........................................................................29

*NetChoice LLC v. Reyes,*
    748 F. Supp. 3d 1105 (D. Utah 2024),
    *appeal filed*, No. 24-4100 (10th Cir. Oct. 11, 2024).......................7, 14, 15, 16,
                                                    29, 32, 40, 43

*NetChoice v. Carr,*
    789 F. Supp. 3d 1200 (N.D. Ga. 2025) ............................................7, 14, 22, 32,
                                                    34, 36, 38

*NetChoice v. Fitch,*
    134 F.4th 799 (5th Cir. 2025) ...................................................16, 17

*NetChoice v. Murrill,*
    2025 WL 3634112 (M.D. La. Dec. 15, 2025) (unpublished) ...............31, 32, 36

*NetChoice, LLC v. Fitch,*
    787 F. Supp. 3d 262 (S.D. Miss. 2025)........................................32, 36

*NetChoice, LLC v. Griffin,*
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) (unpublished)............21, 32, 34

*NetChoice, LLC v. Yost,*
    778 F. Supp. 3d 923 (S.D. Ohio 2025) .........................................14, 29, 31, 32

*Nken v. Holder,*
    556 U.S. 418 (2009)........................................................................43

*Packingham v. North Carolina,*
    582 U.S. 98 (2017).....................................................................1, 6, 17, 19,
                                                     21, 26, 33

*Panhandle E. Pipeline Co. v. State of Okl. ex rel. Comm'rs of the Land Off.,*
    83 F.3d 1219 (10th Cir. 1996) ..........................................................43

*Phelps v. Hamilton,*
    122 F.3d 1309 (10th Cir. 1997) .........................................................16

*PSINet, Inc. v. Chapman,*
    167 F. Supp. 2d 878 (W.D. Va. 2001),
    *aff'd*, 362 F.3d 227 (4th Cir. 2004)...............................................22

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ...................................................................26, 27

*Reno v. ACLU*,
  521 U.S. 844 (1997) ......................................................................4, 31

*Riley v. Nat'l Fed'n of Blind of N. Carolina, Inc.*,
  487 U.S. 781 (1988) ...........................................................................38

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) ..............................................................................40

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
  467 U.S. 947 (1984) ...........................................................................16

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) .....................................................................18, 19

*Speech First, Inc. v. Shrum*,
  92 F.4th 947 (10th Cir. 2024) .......................................................2, 15

*StreetMediaGroup, LLC v. Stockinger*,
  79 F.4th 1243 (10th Cir. 2023) ........................................................38

*TikTok Inc. v. Garland*,
  604 U.S. 56 (2025) ..............................................................................26

*Turner Broad. Sys., Inc. v. F.C.C.*,
  520 U.S. 180 (1997) ...........................................................................30

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000) ...........................................................................30

*United States v. Virginia*,
  518 U.S. 515 (1996) ...........................................................................30

*Universal City Studios, Inc. v. Corley*,
  273 F.3d 429 (2d Cir. 2001) .............................................................19

*Utah Vapor Bus. Ass'n Inc. v. State*,
  772 F. Supp. 3d 1274 (D. Utah 2025),
  *appeal filed*, No. 25-4046 (10th Cir. Apr. 24, 2025) .......................44

*Village of Hoffman Estates v. Flipside*,
  455 U.S. 489 (1982) ...........................................................................38

*Virginia v. Am. Booksellers Ass'n, Inc.*,
  484 U.S. 383 (1988) ...........................................................................15

*Warth v. Seldin*,
  422 U.S. 490 (1975) ...........................................................................16

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)......................................................................40

# STATUTES

App Store Accountability Act................................................1, 14, 31, 33

S.B. 104, the Children's Device Protection Act ....................................34

Texas's App Store Accountability Act .................................................29

Utah Code Ann. § 15-2-2 (1999) ........................................................34

Utah Code § 13-2-5(3) ........................................................................13

Utah Code § 13-11a-4(1)(a)................................................................13

Utah Code § 13-76-101(1)........................................................9, 11, 37

Utah Code § 13-76-101(6)......................................................................4

Utah Code § 13-76-101(7)....................................................................40

Utah Code § 13-76-101(8)..................................................................4, 9

Utah Code § 13-76-101(12)....................................................................9

Utah Code § 13-76-101(15)..............................................................9, 23

Utah Code § 13-76-101(16)....................................................................9

Utah Code § 13-76-101(16)(a).............................................................23

Utah Code § 13-76-101(17)..................................................................10

Utah Code § 13-76-101(17)(a).............................................................37

Utah Code § 13-76-101(17)(b).............................................................40

Utah Code § 13-76-101(18)............................................................11, 25

Utah Code § 13-76-101(19)..................................................................10

Utah Code § 13-76-201.........................................................................44

Utah Code § 13-76-201(1)(a).....................................................12, 14, 15

Utah Code § 13-76-201(1)(a)(ii)............................................................9

Utah Code § 13-76-201(1)(b).....................................................12, 14, 15

Utah Code § 13-76-201(1)(b)(ii) .................................................................................24

Utah Code § 13-76-201(1)(b)(ii)(C) ............................................................................24

Utah Code § 13-76-201(1)(c) ......................................................................................12

Utah Code § 13-76-201(1)(c)(ii) .................................................................................14

Utah Code § 13-76-201(1)(c)(ii)(B) ...........................................................................24

Utah Code § 13-76-201(2) ..........................................................................................12

Utah Code § 13-76-201(2)(a) ......................................................................................14

Utah Code § 13-76-201(2)(b) ................................................................................13, 39

Utah Code § 13-76-201(2)(c) ......................................................................................12

Utah Code § 13-76-201(a) ........................................................................................9, 15

Utah Code § 13-76-201(b) ........................................................................................9, 15

Utah Code § 13-76-201(b)(i) .......................................................................................22

Utah Code § 13-76-201(b)(ii) .................................................................................10, 13

Utah Code § 13-76-201(c)(ii) ......................................................................................15

Utah Code § 13-76-201(c)(ii)(B) .................................................................................10

Utah Code § 13-76-201(d) ............................................................................................9

Utah Code § 13-76-201(f) .............................................................................................9

Utah Code § 13-76-201(f)(ii) .......................................................................................41

Utah Code § 13-76-202 .................................................................................................44

Utah Code § 13-76-202(1)(a) ............................................................................10, 13, 15

Utah Code § 13-76-202(1)(b) ......................................................................................15

Utah Code § 13-76-202(1)(c) ......................................................................................13

Utah Code § 13-76-202(1)(d) ......................................................................................13

Utah Code § 13-76-202(4) ..........................................................................................12

Utah Code § 13-76-202(4)(a) ......................................................................................15

Utah Code § 13-76-202(4)(b) ............................................................4, 8, 13, 15, 35, 39

Utah Code § 13-76-202(4)(c) ..........................................................................12

Utah Code § 13-76-301 ................................................................................13

Utah Code § 13-76-401 ................................................................................44

Utah Code § 13-76-401(1) ........................................................................12, 13

Utah Code § 13-76-401(2) ..........................................................................12

Utah Code § 13-76-402(2) ..........................................................................14

Utah Code § 13-76-402(2)(a)(i) ................................................................11, 37

Utah Code § 13-76-402(2)(a)(ii) ....................................................................39

Utah Code § 13-76-402(4) ..........................................................................13

Utah Code § 76-10-1238(1)(a) ......................................................................34

Utah Code § 78B-3-1001 (2025) ....................................................................34

Utah Code § 78B-6-2601(2) ..........................................................................34

Utah Code § 78B-6-2601(3) ..........................................................................34

Utah Code § 78B-6-2602 ..............................................................................34

**RULES**

Fed. R. Civ. P. 65 ........................................................................................1

Plaintiff Computer & Communications Industry Association ("CCIA") seeks a preliminary injunction under Federal Rule of Civil Procedure 65.

## INTRODUCTION

Imagine a state law that required every bookstore, movie theater, video rental store, record shop, symphony hall, arcade, and newsstand to verify the age of every patron at the door and then required parental consent before those under 18 could enter. Once inside, the parent would have to separately provide consent for every book, newspaper, greeting card, or board game the minor wished to buy, be it a book by Ernest Hemingway or J.K. Rowling, a Taylor Swift album, or a subscription to the Wall Street Journal. Such a law would clearly restrict wide swaths of protected speech under the First Amendment.

Despite the clear constitutional violations, Utah has now passed such a law for the universe of mobile software "apps." The State has enacted Senate Bill 142, the App Store Accountability Act ("S.B. 142" or the "Act") (Ex. A), a sweeping censorship regime that commandeers mobile app stores and app developers to verify the age of each user, deny access to minor users unless they obtain parental consent for every app and every purchase within an app, and potentially publish ratings of app content according to arbitrary state-defined standards. This law transgresses a "fundamental principle of the First Amendment" that "all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

The Court need not break new ground to reach such a conclusion. The U.S. District Court for the Western District of Texas recently enjoined Texas's very similar statute, explaining that a law that "imposes age verification, parental verification, parental consent, and compelled speech

on app stores and app developers . . . restricts access to a vast universe of speech" and thereby violates the First Amendment. *CCIA v. Paxton*, 2025 WL 3754045, at \*1 (W.D. Tex. Dec. 23, 2025) (unpublished), *appeal filed*, No. 26-50001 (5th Cir. Jan. 2, 2026).

Like Texas's law, S.B. 142 violates the First Amendment. *First*, S.B. 142's verification and consent requirements force app stores to restrict speech at three different chokepoints, burdening their protected right to make available and disseminate a wealth of protected speech generated by their users and app developers. These mechanisms similarly burden the First Amendment rights of app developers to distribute their speech, as well as the rights of both adults and minors to access and create a wealth of protected speech as users of the regulated app stores and apps. The legislature has justified these burdens based on the State's desire to shield minors from harmful content, a content-based justification that triggers strict scrutiny. *See Paxton*, 2025 WL 3754045 at \*5.

*Second*, the Act creates an incomplete and insufficient safe harbor that applies only to app developers and can be read to shield developers from liability for age-rating their apps only if they use *Utah's* arbitrary and undefined age categories for apps, rather than developers' and app stores' existing age categorization. If that is what the statute requires, it unconstitutionally compels speech by coercing app stores and developers into re-rating their apps to avoid liability—and does so based on standardless categories that are unconstitutionally vague.

S.B. 142's content-based and compelled speech requirements cannot survive any form of heightened First Amendment scrutiny. The speech burdens the law places on app stores, developers, minors, parents, and other adult users are wildly disproportionate to any interest the State seeks to serve. Worse, those burdens are unnecessary because app stores already offer robust

parental controls that empower parents to achieve the Act's supposed purpose without state-mandated restrictions on the dissemination of speech. The Act also applies its mandates indiscriminately across millions of apps, even as it imposes no obligations at all on materially identical *non-mobile* app stores, apps downloaded outside a mobile app store, websites accessible via web browsers—including browsers on mobile devices—or physical stores and venues.

CCIA, a trade association representing operators of mobile app stores and app developers, seeks a preliminary injunction barring the State from enforcing this unconstitutional regime against its members. As with Texas's very similar—and already enjoined—statute, CCIA is likely to succeed on the merits of its First Amendment claims. *See Paxton*, 2025 WL 3754045, at *10. And because CCIA's app store and developer members face significant nonrecoverable compliance costs and a substantial threat of irreparable harm from the loss of their First Amendment freedoms, the balance of equities and public interest entitle CCIA to a preliminary injunction enjoining Defendants' enforcement of S.B. 142.

## BACKGROUND

### A. CCIA Members Create and Facilitate Protected Speech By Operating App Stores and Developing Mobile Apps.

CCIA is a membership-based trade organization whose members operate some of the world's popular mobile app publishing services (which S.B. 142 calls "App Stores"). Decl. of M. Schruers in Supp. of Pl.'s Mot. for Prelim. Inj. ("Schruers Decl.") ¶¶ 3, 5-6, 28 (Ex. B). An app store is a digital publishing service where software developers can upload apps, and users can discover and download those apps onto their devices. Decl. of M. Bye in Supp. of Pl.'s Mot. for Prelim. Inj. ("Bye Decl.") Decl. ¶ 6 (Ex. C). The app stores operated by CCIA members that are

3

regulated by S.B. 142 are: (1) Google Play; (2) the Amazon Appstore; and (3) Apple's App Store. Schruers Decl. ¶¶ 5, 6-27; Bye Decl. ¶ 3.

CCIA's members are also leading app developers, who create and offer popular mobile apps for download in app stores. Schruers Decl. ¶ 5. Those member-created apps include email apps like Gmail, video-viewing and sharing apps like YouTube, e-book or audiobook apps like Kindle and Audible, and apps that allow users to communicate and obtain information on a wide variety of topics (e.g., IMDb, Goodreads, Twitch). *Id.* ¶¶ 4, 14, 21. The Act's regulatory scope encompasses both CCIA's member app stores, Utah Code §§ 13-76-101(5)-(6),[1] and CCIA's member app developers, § 13-76-101(8), and directly burdens the First Amendment rights of CCIA members in both capacities. Schruers Decl. ¶¶ 5-28, 49-53.

1. Mobile Apps Offer Vast Amounts of Protected Speech and Information

Apps are to smartphones what websites are to computers: mediums for speech "as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 870 (1997) (citation omitted). The variety of mobile apps is vast, and apps allow users to access, create, and exchange an enormous quantity of speech, including every form of protected expression: news and political material, religious material, scientific material, educational content, social media, personal writing, books, magazines, movies, television, short-form video, music, art, games, and much more.[2] Schruers Decl. ¶¶ 29-30; Bye Decl. ¶ 10. In many instances, of course, mobile users can access the same content on a website accessed through a browser. But apps are designed specifically to optimize

---

[1] All statutory citations, unless otherwise noted, will be to the Utah Code.
[2] While the list is endless, a snapshot of mobile apps touching on all categories includes Roblox, NYTimes, Fox News, Bible Chat, Gabb Messenger, Duolingo, Khan Academy, PubMed, Substack, Kindle, Vogue, Netflix, Prime Video, YouTube, Spotify, Poesie, VSCO, and Etsy.

the user experience on mobile devices, thereby allowing users to communicate, receive, and transmit protected expression as they go about their daily lives, rather than only when they are in front of a computer. *See* Decl. of J. Strauser in Supp. of Pl.'s Mot. for Prelim. Inj. ("Strauser Decl.") ¶ 18 (Ex. D).

That app stores are teeming with protected speech cannot be overstated. Their most-downloaded apps offer access to vast amounts of speech, as well as tools for users to create, engage in, and find speech. In the past two years, the most downloaded free apps in Apple's App Store,[3] Google's Play Store,[4] and Amazon's Appstore[5] included: **Threads** (online community where users "come together to discuss everything from the topics you care about today to what's trending tomorrow"); **TikTok, Instagram, and YouTube** (online services whose curatorial and speech-facilitating activities are indisputably protected speech, *see Moody v. NetChoice, LLC*, 603 U.S. 707, 716, 718 (2024)); **CapCut** ("easy-to-use video editing" and animation capabilities); **WhatsApp** (allows users to make calls, message privately, and share files with "friends, family, and colleagues"); **Google** (provides access to Google's search engine to search and access the world's information); and the video streaming services **Tubi**, **Peacock**, and **Pluto TV**. *See also* Bye Decl. ¶¶ 15-17. In addition to these large apps, small app developers also publish a wide array of educational, skill-building, and cultural apps and make up the majority of many app stores. *See*

---

[3] *See* Apple App Store, https://www.apple.com/apps/ (last visited Feb. 3, 2026). The other app on this list is Temu, an online marketplace, which provides access to countless consumer products, including books and games.
[4] Google Play, https://play.google.com/store/apps?device=phone&hl=en_US (last visited Feb. 3, 2026).
[5] *Amazon Best Sellers*, Amazon.com, https://www.amazon.com/gp/bestsellers/mobile-apps/ref=zg_bs?ie=UTF8&tf=1 (last visited Feb. 3, 2026).

*id.* ¶ 17; Compl. ¶ 27, ECF No. 1 (noting that 90% of all developers in Apple's App Store are "small developers").

2. Mobile App Stores Disseminate Vast Amounts of Protected Speech

Apps facilitate vast amounts of speech and expression, and app stores serve a critical role in that speech process. They are curated publishing services where users securely find, review, and download the mobile apps that best suit their interests. *See* Bye Decl. ¶¶ 8, 12-14. App stores also provide a gateway for millions of app developers to disseminate content to reach their users. *Id.* ¶¶ 15-19. In this way, app stores offer a "relatively unlimited, low-cost capacity for communication of all kinds . . . to users engaged in a wide array of protected First Amendment activity on any number of diverse topics." *Packingham*, 582 U.S. at 98 (cleaned up); *see also* Bye Decl. ¶¶ 17-19.

CCIA members operate popular mobile app stores. Google operates Play: "a global digital distribution platform that . . . facilitates access for billions of users worldwide—and millions of users in America—to discover millions of high-quality apps, games, books, movies, and other digital content configured for the Android ecosystem." Bye Decl. ¶ 6. Amazon operates the Amazon Appstore: "an app store for Amazon Fire Tablets . . . [where] customers can discover, download, and save on new apps and games."[6] And Apple operates the App Store: "a safe and trusted place to discover and download … [n]early 2 [million] apps" and "[e]xplore in-app events like movie premieres, gaming competitions, and livestreams."[7]

---

[6] *Amazon Appstore*, https://developer.amazon.com/apps-and-games (last visited Feb. 3, 2026).
[7] *Apple App Store*, https://www.apple.com/app-store/ (last visited Feb. 3, 2026).

These services do not allow just anyone to offer mobile apps for download. They vet developers, screen in-app content, and present only apps that satisfy their requirements. *See* Schruers Decl. ¶¶ 35-36; Bye Decl. ¶¶ 21-22, 26.

These app stores also have adopted voluntary policies to ascribe age ratings for apps based on their content. Schruers Decl. ¶ 34. Apple requires developers to fill out a questionnaire about an app's content themes, and then sets an age rating using its own rating system.[8] On Google Play, age ratings are the responsibility of the app developers and the International Age Rating Coalition ("IARC"). Bye Decl. ¶ 32. Amazon "assign[s] a summary maturity rating to your app" based on information provided by the developer as well as its own review.[9]

### B. Existing Protections for Child-Directed Apps, Including Parental Controls

Parents have many ways to control their children's online experiences. At the device- and network-levels, they can control what devices their children have, and when; they can control the networks minors use to connect to the Internet; and they can manage, via internet service providers, which websites their children can use, and when. *See NetChoice LLC v. Reyes*, 748 F. Supp. 3d 1105, 1126 (D. Utah 2024) (noting that "[o]ther methods exist to advance the goal of protecting children on the internet, including parental controls and web filtering technology"), *appeal filed*, No. 24-4100 (10th Cir. Oct. 11, 2024); *NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1230 (N.D. Ga. 2025) (similar). This array of parental controls allows parents to choose the level of parental oversight based on their child's specific needs, as well as their own.

---

[8] *Set an app age rating*, Apple, https://developer.apple.com/help/app-store-connect/manage-app-information/set-an-app-age-rating/ (last visited Feb. 3, 2026).
[9] *App Submission FAQ*, Amazon.com, https://developer.amazon.com/docs/app-submission/faq-submission.html (last visited Feb. 3, 2026).

On top of the controls available to parents at the device and network levels, CCIA members' app stores also provide robust protections for child-directed apps (that is, apps primarily directed to users under 13). *See generally* Schruers Decl. ¶¶ 36-37. Apple, Google, and Amazon all require child-directed apps to contain only content appropriate for their rated age category, impose additional protections over children's data, and implement parental gates in order to link out of the app, request permissions, or make in-app purchases. Schruers Decl. ¶ 36.

App stores also enable parents to control their children's exposure to apps and content. *See* Schruers Decl. ¶ 37. Google, Apple, and Amazon all provide parental controls that allow parents to lock their children's screens for bedtime, block unwanted apps, filter accessible content by age category, and set up an approval process for purchases and downloads, among other tools. *Id.*; Bye Decl. ¶ 30.

These parental controls are comprehensive, effective, and widely used. Indeed, Google *requires* that parents of children under the age of 13 use its parental controls infrastructure ("Family Link") to create and monitor their child's Google Account. Bye Decl. ¶ 30. And in addition to these comprehensive parental controls offered by app stores, many apps themselves independently offer robust parental controls—including content filters, screen time limits, and supervised accounts. *See* Schruers Decl. ¶ 38; Strauser Decl. ¶¶ 8-10.

## C.  Utah Senate Bill 142

Despite these extensive controls and protections that empower parents to make the best choices for their families, Utah seeks to impose a broad new set of legal mandates that removes and second-guesses parental choice. S.B. 142 puts distinct but related obligations on (1) "[a]pp [s]tores," defined as "publicly available . . . software application[s] … that allow[] users to

download apps from third-party developers onto a mobile device, § 13-76-101(5); and (2) "developer[s]" defined as "a person that owns or controls an app made available through an app store in the state," § 13-76-101(8). These mandates will profoundly affect the mobile app environment and limit its robust exchange of speech and information.

***Verification and Consent Requirements.*** Under the guise of shielding kids from harmful content, S.B. 142 requires all mobile app stores to gatekeep the millions of apps they publish by implementing an onerous state-mandated system of age verification for all users, and parental verification and ongoing consent for minor accounts (collectively, "verification and consent").

*Age verification*. Before any person, of any age, can create an account to access an app store, the app store must "request age information from the individual" and "verify the individual's age category." § 13-76-201(a). The Act creates four "age category" buckets: a "child" under 13; a "younger teenager" between 13 and 16; an "older teenager" between 16 and 18; and an "adult" over 18 years old. § 13-76-101(1). An app store can verify age either by way of "commercially available methods reasonably designed to ensure accuracy," or through some other method "that complies with rules made by the [Utah Division of Consumer Protection]." § 13-76-201(1)(a)(ii). After sorting account holders into age categories, app stores must then transmit this sensitive age category data to app developers, "maintain" it themselves for compliance purposes, and "protect" it using "industry-standard encryption protocols." §§ 13-76-201(d), (f).

*Parental identity verification and account tethering*. If a user is found to be under 18, app stores must then link the minor's account with an account belonging to a parent or guardian. §§ 13-76-201(b); 13-76-101(12), (15)-(16). To do this, the app store must somehow verify that the "parent" either has a parent-child relationship under Utah law, is a legal guardian, or has legal

custody over the minor. § 13-76-101(15). The app store must also verify the parent's age to ensure that they are over the age of 18. § 13-76-101(16).

*Parental consent.* The verification requirements lay the foundation for ongoing mandated parental consent. For accounts belonging to minors, S.B. 142 appears to demand parental consent *every single time* the minor wants to download *any* app or make *any* in-app purchase, and obtain consent again when the app developer makes a "significant" change to the app's terms of service or privacy policy. § 13-76-201(b)(ii), (c)(ii)(B).

*Mandatory data requests, sharing, and app developer re-verification.* The Act also requires app developers to "request personal age verification data or parental consent" every time a user downloads an app, purchases an app, or makes a significant change to the app. § 13-76-202(1)(d). Developers must then "verify" (1) the age category assigned to app users, and (2) for minor users, whether parental consent has been obtained. § 13-76-202(1)(a). These provisions necessitate the sharing of users' personal data with a wide range of app developers with varying levels of digital security and sophistication, Bye Decl. ¶ 43, and essentially demand that app developers build a mechanism to integrate with app stores and verify that consents have been obtained. Strauser Decl. ¶¶ 11-12, 17.

**Age rating and display requirements**. While hardly a model of clarity, the Act can also be read to pressure app developers and app stores to replace their existing age rating systems with the Act's unique age categories. Whenever the parental consent requirement is triggered, an app store must make a "parental consent disclosure," which in turn requires the disclosure of an app's or in-app purchase's age rating. §§ 13-76-101(17), (19). At first blush, the law appears to allow app stores and developers to use their own age ratings and systems if they have them, and does not

require developers to age-rate their apps or in-app purchases if they do not already do so. § 13-76-101(17). But the Act's safe harbor provision applies only "if the developer . . . uses widely adopted industry standards to determine . . . the app's age category." §§ 13-76-402(2)(a)(i). And "age category" is defined to refer only to the Act's four delineated categories of 0-12, 13-16, 16-17, and 18 and above. § 13-76-101(1). Taken together, this language can be read to mean that developers can only use the safe harbor if they use *the Act's* designated age categories—and not other ones, like the widely adopted IARC age rating system—in crafting an age rating. That reading would effectively compel developers to adopt the *State's* preferred method for rating content in lieu of their own preferred (and existing) age rating systems, at great burden and expense and in violation of black-letter First Amendment law. *See* Schruers Decl. ¶ 47; Strauser Decl. ¶¶ 21-23.

***Ongoing notice and consent requirements***. The Act also imposes continuing duties on app developers and app stores alike. *See* Strauser Decl. ¶¶ 31-32. Developers must notify app stores of any "significant change" to an app. § 13-76-202(1)(b). A significant change is a modification to an app's "terms of service or privacy policy" that "changes the categories of data collected, stored or shared;" "alters the app's age rating or content descriptions;" "adds new monetization features" such as "in-app purchases" or "advertisements;" or materially changes the app's functionality or user experience. § 13-76-101(18). After receiving notice of a "significant change," the app store must notify the parent and obtain a renewed parental consent before the minor can continue to use the app. § 13-76-201(1)(c)(ii).

To contextualize the combined effect of all these requirements, consider their effect on Audible, an app that allows listeners to access millions of audiobooks, podcasts, and original adaptations of literature via in-app download or purchase. Strauser Decl. ¶ 3. Starting on May 6,

2026, every accountholder who seeks to download Audible from an app store will have to first prove their age to the app store. For any user who doesn't want to verify their age due to privacy concerns, or who cannot verify their age because they lack the required documentation, Utah will bar them from accessing the app store in its entirety, and that user will be unable to download Audible or any other app. For those users who do age verify, app stores cannot allow anyone under 18 to download Audible (or any other mobile app) unless their account is first linked to the account of a verified parent or legal guardian and the parent has expressly consented to that specific app download. And even after clearing an initial age-verification process, an account link process (which includes more age verification), and obtaining parental consent to download the app itself, the minor *still* cannot purchase an audiobook or any other content within the Audible app without an additional parental consent. On top of that, whenever Audible makes a "significant change" to its terms of service—possibly triggered by the mere addition of a new audiobook or advertisement, or design update to the platform—the minor's access to the app will pause, and the parent will need to redo the consent they already provided.

*Statutory violations and enforcement*. Section 13-76-401(2) contains a private right of action that permits minors or their parents to sue for damages arising from § 13-76-201(2) or § 13-76-202(4). Specifically, private individuals may sue where an app store or developer attempts to enforce a contract against a minor without first obtaining parental consent; and they can sue for any knowing misrepresentations of information in the parental disclosure, which separately "constitutes a deceptive trade practice." § 13-76-401(1). Individuals can also sue if an app store or developer shares age category data with any person. §§ 13-76-201(2)(c);13-76-202(4)(c).

The remainder (and majority) of the provisions are not enforceable under the private right of action, and thus appear enforceable only by the Attorney General. Those include an app store's failure to abide by the age verification and parental consent requirements, § 13-76-201(1)(a)-(c); a developer's failure to use age verification data to verify age category or use the data to enforce their own terms of service, §§ 13-76-202(1)(a), (c); or an app store's or developer's failure to request parental consent before permitting an app to be downloaded, §§ 13-76-201(b)(ii), 13-76-202(1)(d). Indeed, the Attorney General and the Director of Consumer Protection have been delegated with the authority to rule-make and/or enforce the Act's provisions. *See* Compl. ¶¶ 21-24, ECF No. 1; §§ 13-76-301 (providing rulemaking authority to the Division of Consumer Protection), 13-2-5(3) (providing the Division with enforcement authority over rules it promulgates). In addition to the rulemaking and enforcement authority it bestows upon the Division, the Act further signals its grant of enforcement authority to both Defendants by classifying violations of Subsections 13-76-201(2)(b) and 13-76-202(4)(b) as "deceptive trade practice[s]" §§ 13-76-401(1), 13-11a-4(1)(a). Furthermore, the Act's savings clause appears to preserve the Attorney General's authority to enforce each of the Act's provisions, including those enforceable under the private right of action. § 13-76-402(4).

## ARGUMENT

CCIA and its members are entitled to a preliminary injunction against the Attorney General and Director of Consumer Protection as they are charged with enforcing S.B. 142. *See generally Ex parte Young*, 209 U.S. 123 (1908).

A preliminary injunction is warranted, as (1) CCIA and its members are "substantially likely to succeed on the merits"; (2) they will "suffer irreparable injury if the court denies the

injunction"; (3) the "threatened injury (without the injunction) outweighs the opposing party's under the injunction"; and (4) the injunction "isn't adverse to the public interest." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (cleaned up). All factors weigh in favor of a preliminary injunction here.

S.B. 142's age verification, parental verification, and parental consent requirements are unconstitutional both facially and as applied to all CCIA member mobile app stores (e.g., Google Play, Amazon Appstore, and Apple App Store). §§ 13-76-201(1)(a)-(b), (1)(c)(ii), (2)(a). Similar to the Utah law facially enjoined last year, S.B. 142's unconstitutional verification and consent mandates apply uniformly across all app stores. *Reyes*, 748 F. Supp. 3d at 1120, 1121 n.92 (facial challenge appropriate where law imposed age assurance and other requirements on social media companies); *see also Paxton*, 2025 WL 3754045, at *1, 8-9 (finding facial challenge to strikingly similar Texas "App Store Accountability Act" appropriate); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 947 (S.D. Ohio 2025) (same, for similar law imposing age verification and other requirements on social media companies); *Carr*, 789 F. Supp. 3d at 1218 (same). A facial challenge is particularly appropriate here because CCIA's app store members encompass most, if not every, hypothetical application of the law to mobile app stores writ large.[10]

CCIA also brings a facial challenge to S.B. 142's provisions that induce or incentivize app developers, on an ongoing basis, to age-rate their apps using the Act's age categories. § 13-76-402(2). Strauser Decl. ¶¶ 21-22. This challenge is also brought as applied to CCIA's app developer members.

---

[10] Indeed, CCIA members Apple and Google were explicitly singled out in the Senate Committee Hearing. *See* Himonas Decl., Ex. E-1 at 8:10-16.

CCIA brings an as-applied challenge to S.B. 142's provisions that: (1) forbid developers from providing their apps (or allowing the sale of any in-app content) to minors without verifying their ages and obtaining parental consent; and (2) require developers to notify app stores of "significant change[s]" to their apps. *See* §§ 13-76-201(a)-(b), (c)(ii), 202(1)(a)-(b), 202(4)(a)-(b). This challenge is asserted on behalf of CCIA member app developers in the business of facilitating access to protected speech whose First Amendment rights are burdened by the Act. Schruers Decl. ¶¶ 3, 5, 47-55; Strauser Decl. ¶¶ 2-7; 11-18.

## I. CCIA HAS STANDING TO BRING THIS CHALLENGE.

*Associational Standing.* CCIA has associational standing to assert these claims because (1) some of its members have standing as they are "subject to the Act and will face injury in the form of liability if they violate its operative provisions," (2) challenging S.B. 142 is germane to CCIA's mission; and (3) members' individual participation is unnecessary in this purely legal challenge. *Reyes*, 748 F. Supp. 3d at 1118-19 (NetChoice, a similar trade association, had standing to bring a facial and as-applied constitutional challenge on behalf of its members); *see also Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024); *Paxton*, 2025 WL 3754045, at *4-5 (finding CCIA had associational standing to challenge similar Texas statute); Schruers Decl. ¶¶ 3, 5, 55.

*First*, CCIA "has standing to bring a pre-enforcement facial challenge against [S.B. 142]" because the law is "aimed directly at" CCIA's app store and developer members, "who . . . would have to take significant and costly compliance measures" to implement S.B. 142's onerous requirements across their technologies. *Reyes*, 748 F. Supp. 3d at 1119, n.78 (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988)). Schruers Decl. ¶¶ 43-47. CCIA's app store

and developer members can also seek prospective relief because they operate in Utah and face a "good chance of being . . . injured in the future" through the imposition of statutory liability if they refuse to comply with the Act's unconstitutional provisions. *Dias v. City & Cnty of Denver*, 567 F.3d 1169, 1177 (10th Cir. 2009) (quotation omitted); Schruers Decl. ¶¶ 8-27.

*Second*, CCIA's purpose is to "promote[] open markets, open systems, and open networks, and advocate[] for the interests of the world's leading providers of technology products and services[.]" Schruers Decl. ¶¶ 3, 55. Because this lawsuit—brought to enjoin unconstitutional restrictions on access to and distribution of speech through mobile apps—"is centered on doing exactly that, [CCIA] seeks to vindicate interests germane to its purpose." *NetChoice v. Fitch*, 134 F.4th 799, 804 (5th Cir. 2025); *see also Reyes*, 748 F. Supp. 3d at 1119.

*Third*, CCIA's claims "do not require the participation of individual members in the lawsuit." *Reyes*, 748 F. Supp. 3d at 1119 (cleaned up). Because the age-verification and parental-consent requirements affect all covered app stores equally, their claims "can be proven without fact-intensive individualized inquiry" into CCIA's individual members, as is the case here. *Id*. Moreover, "the prospective relief [CCIA] seeks 'will inure to the benefit of those members of the association actually injured." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)). So too with the as-applied challenges for CCIA's mobile app developer members, whose expressive services are equally blocked when their audiences cannot pass the verification and consent hurdles, and burdened by the compulsion to age-rate the content in their apps.

**Prudential Standing.** CCIA also has prudential standing to assert the First Amendment rights of its members' users—the people who use app stores to access the speech, ideas, and information that mobile apps offer. "[B]ecause of the significance of First Amendment rights, the

Supreme Court 'has enunciated other concerns that justify a lessening of prudential limitations on standing.'" *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997) (quoting *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)). "[W]hen there is a danger of chilling free speech . . . [l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). As the Fifth Circuit recently recognized in *NetChoice v. Fitch*, CCIA's members (and CCIA as an association) are permitted to assert users' First Amendment rights because "violation of those rights adversely affects the platform." 134 F.4th at 807; Schruers Decl. ¶¶ 50, 52-54.

## II. CCIA IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIRST AMENDMENT AND VAGUENESS CLAIMS.

### A. S.B. 142's Verification and Consent Requirements Violate the First Amendment.

1. App Stores, Developers, and Users Enjoy First Amendment Protections When They Create, Access, and Disseminate Speech.

The basic principles of freedom of speech "do not vary when a new and different medium for communication appears." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (citation omitted). App stores and mobile apps provide users with access to spaces where they can "engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Packingham*, 582 U.S. at 105 (citation omitted). *See supra* at 5-6. Indeed, the apps that CCIA's members have developed are both themselves protected speech and facilitate the creation of and access to broad tracts of speech. Schruers Decl. ¶¶ 29-32. For example, through CCIA members' apps, users can download ebooks on Kindle; watch movies or TV shows produced by Amazon

17

MGM Studios on Prime Video; listen to an "Audible Original" adaptation of *Pride and Prejudice*; and view or post videos on YouTube. *Id.* ¶ 30.

These examples are just the tip of the iceberg, and all of it is speech protected by the First Amendment. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) ("All manner of speech—from pictures, films, paintings, drawings, and engravings, to oral utterance and the printed word—qualify for the First Amendment's protections; no less can hold true when it comes to speech … conveyed over the Internet.") (cleaned up); *Brown*, 564 U.S. at 791 ("Like the protected books, plays, and movies that preceded them, video games communicate ideas—and even social messages—through many familiar literary devices . . . and through features distinctive to the medium (such as the player's interaction with the virtual world)."). Likewise with apps that provide access to informational tools like maps, calculators, compasses, and reference material. "Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011).

App stores are unquestionably protected by the First Amendment in their role publishing and disseminating this vast array of speech—just as bookstores are protected as avenues for dissemination of published texts. It is well settled that both "the creation and dissemination of information are speech[.]" *Sorrell*, 564 U.S. at 570. "If the acts of disclosing and publishing information do not constitute speech, it is hard to imagine what does fall within that category[.]" *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (cleaned up); *accord Genusa v. City of Peoria*, 619 F.2d 1203, 1218 (7th Cir. 1980) ("Preservation of freedom of expression requires protection of the means of disseminating expression.").

Likewise protected are app developers, who create protected expression in the form of mobile apps—many of which further facilitate the dissemination and creation of speech and information by app developers themselves, by their users, or by third-parties. *See 303 Creative*, 600 U.S. at 600 (website design is speech); *Packingham*, 582 U.S. at 104 (online speech forums protected by First Amendment); *Moody*, 603 U.S. at 728 ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 447-48 (2d Cir. 2001) (computer software programs that "convey information capable of comprehension and assessment by a human being" are "speech" protected by the First Amendment). In short, "[w]hether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown*, 564 U.S. at 792 n.1.

Beyond this baseline protection, app stores are further protected by the First Amendment when they exercise editorial control over the apps that they publish, including by vetting, curating, arranging, and specifying content ratings for third-party apps. *See* Bye Decl. ¶¶ 7, 9, 12-14; Schruers Decl. ¶¶ 35-36. "Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Moody*, 603 U.S. at 731-32. Those editorial rights are compromised when "subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell*, 564 U.S. at 568 (citation omitted).

These First Amendment protections fully apply to the dissemination of all speech to minors, who "are entitled to a significant measure of First Amendment protection," apart from a few "narrow and well-defined" categories of unprotected speech. *Brown*, 564 U.S. at 794 (cleaned up). Nor does the fact that app stores and developers operate for profit, and sell rather than give

away certain apps, undermine their First Amendment rights. *See id.* (striking down law limiting the sale or rental of video games); *303 Creative LLC*, 600 U.S. at 594 ("Many of the world's great works of literature and art were created with an expectation of compensation."); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) ("That the Times was paid for publishing the advertisement is [] immaterial").

## 2. S.B. 142 Burdens These Rights by Restricting Speech at Three Chokepoints.

"Laws enacted to control or suppress speech may operate at different points in the speech process." *Citizens United v. FEC*, 558 U.S. 310, 336 (2010). S.B. 142's central mechanism is an interlocking series of verification and consent requirements that inhibit the free flow of speech at key chokepoints: **(1) account creation** [via age verification, parental tethering]; **(2) prior to downloading each app** [parental consent]; and **(3) continually, with every in-app purchase and significant change to an app's terms of service** [parental consent]. Failure at any one of these steps will cut off users from accessing speech and app developers and app stores from being able to disseminate their own speech and third-party speech to the public.

### a) *Chokepoint 1: Age Verification and Parental Tethering at Account Creation*

Because app stores are the initial gateway to accessing any app and any speech therein, an access burden at the account-creation level operates as a barrier at the very threshold of speech disseminated via mobile apps. *See* Bye Decl. ¶¶ 10, 45-46; Schruers Decl. ¶¶ 29, 53. Yet S.B. 142 begins by imposing onerous requirements at exactly that level.

***Step 1: Age Verification.*** S.B. 142 prohibits anyone—be they 12, 35, or 60—from accessing any app without first clearing an invasive age verification hurdle. The Supreme Court has confirmed that submitting to age verification is a burden on "the right to access speech." *Free*

*Speech Coal., Inc.* ("*FSC*") *v. Paxton*, 606 U.S. 461, 482-83 (2025). That's especially true here where, in contrast to the law at issue in *Free Speech Coalition*, the speech at issue is protected as to both adults and minors, who equally have a First Amendment right to access it.

S.B. 142's age verification requirement will entirely bar the following users from receiving and producing speech on every single mobile app: users who (1) cannot adequately verify their age because they lack the type of age verification necessary, such as an ID or credit card, (2) do not want to submit to age verification due to concerns about privacy; and (3) are minors who lack adequate documentation—whatever that may be—or parental involvement to link a parent's account. *See* Bye Decl. ¶¶ 38, 42, 45; Schruers Decl. ¶¶ 11, 45. *See also* Tr. of Jan. 28, 2025 Utah Senate Committee Hearing re Senate Bill 142, Himonas Decl. Ex. E-1, at 10:2-9 (explaining that "this [law] is going to require a government ID to be uploaded to show, like if you're an adult . . . And so, what I'm anticipating is that that legal document that's showing the guardianship or showing the emancipation could be uploaded in a similar manner."). These restrictions cannot be reconciled with the protections afforded by the First Amendment. *See Packingham*, 582 U.S. at 108 ("[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights.").

Age verification requirements also burden speech by making speaking and accessing speech contingent on abdicating the right to anonymity. *See* Bye Decl. ¶ 38. But anonymity too is "an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995). Verifying one's age—such as by "upload[ing] official government documents and submit[ting] to biometric scans," or linking to a credit card—

forces adults to "forgo the anonymity otherwise available on the internet." *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *17 (W.D. Ark. Aug. 31, 2023) (unpublished) (quotation omitted)).

Age verification has a further chilling effect by forcing users, as a precondition to accessing protected speech, to permit their age and identity to be shared with and collected by developers.[11] "Requiring Internet users to provide . . . personally identifiable information to access a Web site would significantly deter many users from entering the site, because Internet users are concerned about security on the Internet and . . . afraid of fraud and identity theft[.]" *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007), *aff'd*, 534 F.3d 181 (3d Cir. 2008); *accord PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001) ("Fear that cyber-criminals may access their [identifying information] . . . . may chill the willingness of some adults to participate in the 'marketplace of ideas[.]'"), *aff'd*, 362 F.3d 227 (4th Cir. 2004); *Carr*, 789 F. Supp. 3d at 1225 (age verification and parental consent provisions "create serious data privacy vulnerabilities"). Such concerns could be compounded where, as here, app stores must share users' age category signals across millions of apps and developers, each with their own varying levels of data security. *See* Bye Decl. ¶¶ 43-44. That added risk and burden for both users and developers is particularly striking when many apps would have no desire to ingest or use that information otherwise. *See* Bye Decl. ¶ 44.

*Step 2: Parental Tethering and Verification.* If, at the age verification step, a user cannot sufficiently prove that they are over 18, S.B. 142 forces the user to link their account to that of a

---

[11] *See, e.g.*, Robert Booth, *Hack of Age Verification Firm May Have Exposed 70,000 Discord Users' ID Photos*, The Guardian (Oct. 9, 2025), https://www.theguardian.com/media/2025/oct/09/hack-age-verification-firm-discord-users-id-photos.

parent or guardian. § 13-76-201(b)(i). The parent or guardian must then undergo an even more arduous verification process to prove that they (1) have legal authority over a minor's account, and (2) are an "adult," i.e., over 18 years old. §§ 13-76-101(15)-(16)(a).

It is not clear how app stores are supposed to verify that an "adult" seeking affiliation with a minor's account is a parent or legal guardian. *See* Bye Decl. ¶ 39. But it is clear that those who cannot meet this burden face yet another significant bar to accessing the marketplace of ideas. And it is easy to conceive of the types of people who will face extreme difficulties meeting these proof burdens. Parents often have different last names than their children and may have a different address; most children do not have government IDs; and children in foster care or nontraditional family situations may not have a legal guardian who is able or willing to be linked to the child's account. *See* Schruers Decl. ¶ 46; Bye Decl. ¶ 39. These children—whether they are 7 or 17—will be barred from speaking and accessing app-based speech, or excessively burdened by trying to fulfill alternative verification measures, should any exist. Bye Decl. ¶ 39.

b) *Chokepoint 2: Parental Consent Required for Each App Download*

The initial verification requirements are merely the first hurdle, serving as the foundation for the Act's recurring parental consent mandates. By triggering a new check each time a minor attempts to download an app, this second chokepoint burdens minors, families, and app stores and developers who wish to communicate speech that minors have every right to access. The Supreme Court has expressly rejected the argument that "the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3 (emphasis added). But under the Act, parents must approve a 17-year-old's download of the Audible app (which provides access to countless audiobooks and podcasts), or apps facilitating

Bible study or providing political news. *See* Strauser Decl. ¶¶ 13-17. That alone creates a substantial—and in many instances complete—obstacle to the exchange of protected speech between app developers and minor users. *See* Schruers Decl. ¶¶ 50, 53.

Even where parents may have no objection to the apps their children wish to download or purchase, the parental consent hoop seriously impedes access to speech. The process is logistically cumbersome, especially because parents must apparently separately authorize the download of every individual app and in-app purchase. § 13-76-201(1)(b)(ii). This imposes considerable friction on minors and parents in everyday life. Consider the 17-year-old trying to download an app to complete a homework assignment when their parent is at work, traveling, or otherwise not monitoring their device to provide consent. *See also* Bye Decl. ¶ 42 (discussing anticipated negative impact on user experiences and ability to access speech).

c) *Chokepoint 3: Ongoing Parental Consent for In-App Purchases and Significant Changes to App Terms*

A minor that clears the two chokepoints above faces yet additional hurdles to accessing protected speech in the apps their parents have *already approved*. S.B. 142 requires app stores to obtain ongoing parental consent for any in-app purchases. § 13-76-201(1)(b)(ii)(C). Additionally, whenever an app developer makes a "significant change" to its app or to its terms of service or privacy policy, the app store must again effectively restrict the minor's access to the app—and all the speech it contains—until the app store obtains "renewed verifiable parental consent." § 13-76-201(1)(c)(ii)(B).

The parental consent requirements at these chokepoints further arrest the natural flow of speech facilitated by app stores. The requirement to obtain consent for each in-app purchase imposes a particularly outsized burden on apps whose models of speech dissemination include

24

revenue from in-app purchases, such as Audible, Kindle, Adobe Illustrator, Prime Video, Substack, and many others. *See* Strauser Decl. ¶¶ 4, 15, 17. This erects barriers to the dissemination of nearly every kind of speech, including books, movies, music, video games, and magazine subscriptions. Indeed, as of May 6, 2026, minors will have to request parental consent every time they want to purchase a new audiobook on Audible, rent certain movies on Prime Video, or subscribe to certain authors on Substack—as well as make purchases within thousands of innovative apps of smaller developers that range from offering language courses to guided museum tours to instruction in guided meditation. *See* Bye Decl. ¶ 17. These provisions also deprive parents of the ability to decide their preferred level of supervision over their teen's engagement with content—a functionality that existing parental controls provide—and forces them into granular approval or disapproval of every single app download and in-app purchase, even where they might prefer a more hands-off or categorical approach. *See* Schruers Decl. ¶¶ 37-38.

The speech burdens of the "significant change[s]" requirement are similarly onerous. Any time new "advertisements" or "monetization features" are added to an app (to name just a few example triggers), the developer must apparently notify the app store. § 13-76-101(18). That renders the parent's prior consent stale, and so the app store must then "obtain renewed verifiable parental consent" for the minors' continued use of the app. § 13-76-201(c)(ii)(B). But apps routinely roll out new features that may include new advertisements or purchase opportunities, which means the State is now regulating what is a quotidian experience on many apps. In theory, every new audiobook on Audible or movie made available for purchase on Prime Video might be considered a new "monetization feature" under the Act, triggering an entirely new parental consent obligation. Strauser Decl. ¶¶ 4, 31-32. Once more, the Act imposes constant interruptions on access

to and dissemination of speech for apps and users, and drastically increases the barrage of consents pushed on parents. *See* Bye Decl. ¶ 41 (parental consent provisions "will exponentially expand . . . the number of approvals that must be obtained").

### 3. S.B. 142's Verification and Consent Regime Triggers Strict Scrutiny.

On its face, the Act subjects all speech—protected and unprotected—to its onerous verification and parental consent chokepoints. In directly burdening access to and dissemination of speech, the law must face heightened First Amendment scrutiny. *See, e.g.*, *TikTok Inc. v. Garland*, 604 U.S. 56, 67-68 (2025) (First Amendment scrutiny applies to "governmental regulation of content that has an expressive element" or that "impose[s] a disproportionate burden upon those engaged in protected First Amendment activities"); *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705 (1986) (laws that "single out . . . [those engaged in First Amendment protected activities" trigger strict scrutiny). Indeed, heightened scrutiny applies regardless of whether the law is content based or content neutral. *See, e.g., Packingham*, 582 U.S. at 106-07 (assuming statute barring sex offenders from accessing social media service was content neutral and applying intermediate scrutiny). But even a law that is facially content neutral can trigger strict scrutiny where it is content-based "in its justification," or where it directly rather than incidentally burdens protected speech. *FSC*, 606 U.S. at 482-83. Here, the Act is both content-based in its justification and it directly burdens fully protected speech, and so strict scrutiny is the appropriate standard.

### a) *The State's Purpose Is to Bar Access to Content.*

"A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content.'" *City of Austin v. Reagan Nat'l Advertising Of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)) This

inquiry often "turns on the government's purpose." *Harmon v. City of Norman*, 981 F.3d 1141, 1148 (10th Cir. 2020) (citation omitted). Here, content-based favoritism (or perhaps vilification) is exactly what the legislature intended when enacting S.B. 142. When introducing S.B. 142, Senator Weiler, the Act's sponsor, explained the motivation for the bill by noting that "Instagram has rated itself as friendly for 12 year olds" despite containing content he considers to be just shy of "porn." Himonas Decl. Ex. E-1 at 2:12–3:2.[12] Shortly thereafter, when his co-drafter Melissa McKay discussed the age verification requirement, she justified it by noting that "Instagram has done a lot of work in the last couple of years to try to protect children from harmful content . . . But if they do not know the age of the child, they can't protect the . . . child." *Id.* at 7:23–8:5. Because, quite literally, S.B. 142's verification and consent regime "cannot be justified without reference to the content of the regulated speech," it is subject to strict scrutiny. *Reed*, 576 U.S. 155 at 164 (citation and quotation marks omitted); *see also Paxton*, 2025 WL 3754045 at *5 ("SB 2420 specifically sought to shield minors from certain speech the State deems objectionable or harmful . . . which is a content-based justification and would still warrant strict scrutiny.") (citing *Boos v. Barry*, 485 U.S. 312, 321 (1988)).

b) *S.B. 142 Directly Burdens Fully Protected Speech.*

Although "a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary." *Reed*, 576 U.S. at 165-66 (quotation omitted). The Supreme Court's recent decision in *Free Speech Coalition* confirms that the Act should be

---

[12] Senator Weiler concluded his example by stating: "Does Instagram have blatant, hard-core pornography like Twitter? No, it does not. But it goes right up to that line and dances on it. And they're very aware of this, and after many years of repeated calls to address it, they have willfully and intentionally turned and looked the other way. And so I want to start with that[.]" Himonas Decl. Ex. E-1 at 2:24–3:6.

subject to strict scrutiny because, in addition to its content-based purpose, it directly burdens protected speech. In that case, the Supreme Court considered the level of scrutiny that applied to a Texas law imposing age verification requirements on pornographic websites. 606 U.S. at 477-95. The Court first found that strict scrutiny did not apply because "[o]n its face, the statute regulates only speech that is obscene to minors" and could "easily be justified without reference to the protected content of the regulated speech." *Id.* at 482. Instead, the Court held that intermediate scrutiny applied because its scope and purpose was limited to restricting minors' access to a narrow category of speech *that was not fully protected by the First Amendment* (material legally obscene as to minors). *Id.* at 480, 482, 490-92, 499. Because the law used age verification only to prevent minors from accessing material that they have no right to access, the Court reasoned, "[a]ny [First Amendment] burden experienced by adults is therefore only incidental to the statute's regulation of activity that is not protected by the First Amendment. That fact makes intermediate scrutiny the appropriate standard under our precedents." *Id.* at 483.

That rationale does not apply here. S.B. 142 is not narrowly targeted to obscenity or some other category of unprotected speech. Quite the contrary, Utah's law imposes its age-verification and consent regime on virtually *every* app in *every* mobile app store, including apps that offer speech on matters of public interest that is not only protected as to minors but lies at the heart of the First Amendment for parents and minors alike. S.B. 142 thus is no mere incidental burden on speech, but a *direct* burden that "restricts access to a vast universe of speech." *Paxton*, 2025 WL 3754045 at *1 (rejecting state's reliance on *Free Speech Coalition* in enjoining law imposing age-verification and parental consent requirements on mobile app stores). As a court in this District ruled just last year, "laws that require parental consent for children to access constitutionally

protected, non-obscene content, are subject to strict scrutiny." *Reyes*, 748 F. Supp. 3d at 1126 n.135 (quoting *Yost*, 716 F. Supp. 3d at 558).

     *Free Speech Coalition* found persuasive the analogy of the online age verification restriction to its brick-and-mortar equivalent: Because access to pornography in the physical world unproblematically requires proof of age, the Court suggested, the same should be true online. 605 U.S. at 480-84. But that same principle cuts decisively *against* Utah here. The law never has (and almost certainly *could not)* required age verification, parental verification, or parental consent for the brick-and-mortar equivalent of S.B. 142—functionally akin to vast public squares that offer access to movie theaters, libraries, bookstores, music stores, museums, educational services, and more. *See Paxton*, 2025 WL 3754045 at *1 (finding that identical requirements in Texas's App Store Accountability Act are "akin to a law that would require every bookstore to verify the age of every customer at the door and, for minors, require parental consent before the child or teen could enter and again when they try to purchase a book."); *Yost*, 778 F. Supp. 3d at 957 (analogizing to a public library); *Brown*, 564 U.S. at 795 n.3 (explaining that laws making it unlawful to allow minors to attend political rallies or receive religious tracts without their parents' consent would almost certainly be unconstitutional). The logic of *Free Speech Coalition* thus underscores the need for strict scrutiny here.

     4.  The Verification and Consent Requirements Are Not Narrowly Tailored and Cannot Survive Any Form of Heightened Scrutiny.

     "Strict scrutiny … is 'the most demanding test known to constitutional law.'" *FSC*, 606 U.S. at 484 (citation omitted). Laws triggering strict scrutiny "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Nat'l Inst. of Fam. & Life Advocs. ("NIFLA") v. Becerra*, 585 U.S.

755, 766 (2018) (citation omitted). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000).

But even if intermediate scrutiny applied, it is also rigorous. *City of Austin*, 596 U.S. at 76. "[T]o survive intermediate scrutiny, a restriction on speech or expression must be narrowly tailored to serve a significant governmental interest." *Id.* (citation and quotation marks omitted); *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1220 (10th Cir. 2021). The statute must "advance[] important governmental interests *unrelated to the suppression of free speech*" and must "not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997) (emphasis added); *Brewer*, 18 F.4th at 1221-22. Although the standard is less exacting than strict scrutiny, "the burden of justification is demanding and it rests *entirely* on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (emphasis added). "By demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (cleaned up).

Beginning with Utah's supposed governmental interest, S.B. 142 fails both strict and intermediate scrutiny because the State enacted the Act with the express purpose of restricting minors' access to purportedly harmful speech. The Act's sponsors confirmed the Act seeks to protect children from online content the Legislature believes may be harmful, Himonas Decl. Ex. E-1 at 2:12–3:6. But "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply." *Brown*, 564 U.S. at 804–05. Thus, while states have "legitimate power to protect children from harm," the Supreme Court has made clear that this "does not include

a free-floating power to restrict the ideas to which children may be exposed." *Id*. at 794-95 (cleaned up). Similarly, "the governmental interest in protecting children from harmful materials . . . does not justify an unnecessarily broad suppression of speech addressed to adults." *Reno*, 521 U.S. at 875. That is particularly true here where app stores (and others) *already offer* the parental controls the Act would make mandatory, so that the Act's primary effect is to *compel* the use of such controls on parents who have already opted not to use them.

Even if the State has a significant or compelling (or even legitimate) interest in forcing parents to micromanage their children's expressive pursuits online, Utah cannot meet its burden of satisfying any form of heightened scrutiny. The very breadth of the statute dooms the Act from the start: S.B. 142 requires age verification and parental consent as a prerequisite to *every* mobile app download and in-app purchase, but it cannot come close to showing that there is any relationship between the *content* of *all mobile apps* and harms to minors. *See Paxton*, 2025 WL 3754045 at *7 (preliminarily enjoining App Store Accountability Act under strict and intermediate scrutiny, noting that "the State does not cite evidence to substantiate the assertion that downloading an app of any kind without parental permission poses a health hazard to minors"); *NetChoice v. Murrill*, 2025 WL 3634112, at *36 (M.D. La. Dec. 15, 2025) (unpublished) (permanently enjoining social media law, finding that its "age-verification and parental-consent requirements fail strict *and* intermediate scrutiny" because "Defendants have not established a causal relationship between social media use and health harms to minors"); *Yost*, 778 F. Supp. 3d at 955-56 ("The record also does not show that the full range of . . . websites covered by the Act *cause[s]* harms to minors sufficient to suppress those minors' access to protected speech.").

Indeed, S.B. 142's verification and consent provisions are fatally overbroad, strikingly

underinclusive, and ignore far less restrictive alternatives.

a) *The Act's Verification and Consent Regime Is Overinclusive.*

As discussed, S.B. 142 is anything but targeted, and certainly seeks to do vastly more than wall off minors from material that they have no constitutional right to access. Instead, Utah's law imposes verification requirements for adults and minors alike on apps that offer newspaper content, sports coverage, religious worship, basic information services such as maps and calculators, and all manner of entirely benign and unequivocally protected speech. *See Paxton*, 2025 WL 3754045 at *7 (holding similar Texas law over-inclusive because "[in] its attempt to block children from accessing harmful content on select apps, Texas also prohibits minors from participating in the democratic exchange of views online by curtailing their access to all apps"). And by placing its access gates on children *and adults* prior to accessing an app, the Act regulates far more than just the enforceability of contracts between apps and children.

It is hard to conceive of a less narrowly tailored solution to the State's asserted interests. Indeed, the sheer volume of protected speech subject to S.B. 142's scheme is far greater than the restrictions on violent video games in *Brown*, the restrictions on access to social media websites enjoined by district courts in Utah and other states,[13] and the age-verification requirement tailored to pornographic websites in *Free Speech Coalition*. Utah's statute is the equivalent of forcing bookstores to "card" all customers for each purchase and prohibit the sale of any books to minors without express parental permission. *See Paxton*, 2025 WL 3754045, at *1; *Brown*, 564 U.S. at

---

[13] *See Reyes*, 748 F. Supp. 3d at 1131 (D. Utah 2024); *Murrill*, 2025 WL 3634112, at *2-3; *CCIA v. Paxton*, 747 F. Supp. 3d 1011, 1038 (W.D. Tex. 2024); *Carr*, 789 F. Supp. 3d 1200, 1230 (N.D. Ca. 2025); *NetChoice, LLC v. Fitch*, 787 F. Supp. 3d 262, 282 (S.D. Miss. 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 959 (S.D. Ohio 2025); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023).

795 n.3. Even under intermediate scrutiny, that requirement "burden[s] substantially more speech than is necessary to further" Utah's modest interest in providing restrictions for minors around pornography and contracts. *FSC*, 606 U.S. at 496; *see also Packingham*, 582 U.S. at 106; *Paxton*, 2025 WL 3754045, at *7 (finding App Store Accountability Act failed under both intermediate scrutiny and strict scrutiny).

> b)  *Existing Parental Controls and Laws Diminish the State's Interest and Further the Act's Tailoring Problem.*

S.B. 142's parental consent requirements amplify the speech burdens on minors and parents and force a government solution where ample private solutions are already in place. In *Brown*, the Supreme Court explained that the existing "voluntary rating system designed to inform consumers about the content of games . . . does much to ensure that minors cannot purchase seriously violent games on their own, and that parents who care about the matter can readily evaluate the games their children bring home." 564 U.S. at 803. "Filling the remaining modest gap in concerned parents' control can hardly be a compelling state interest." *Id.*

Likewise, under intermediate scrutiny, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen*, 573 U.S. at 495. Yet here, the State has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *Id.* at 491. The mobile app stores and apps that S.B. 142 regulates already have meaningful voluntary protections that facilitate parental control. *See* Schruers Decl. ¶¶ 33-38; Bye Decl. ¶ 29 ("Google already offers parents most of the controls the Act would make mandatory and takes additional measures to help ensure an age-appropriate experience with respect to Google Play apps."). As in *Brown*, the State cannot provide evidence that its *less robust* version of controls that App Stores have already

developed on a voluntary basis "meet[s] a substantial need of parents who wish to restrict their children's access to [apps] but cannot do so." *Griffin*, 2025 WL 978607, at *14 (citing *Brown*, 564 U.S. at 803); *accord Carr*, 789 F. Supp. 3d at 1229 (noting same); *CCIA v. Uthmeier*, 2025 WL 1570007 at *18 (N.D. Fla. June 3, 2025) (unpublished). Thus, Utah's "purported aid to parental authority is vastly overinclusive .… While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want. This is not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Brown*, 564 U.S. at 804.

On top of these voluntary solutions are legislative solutions that already address Utah's purported concerns about online pornography and the enforceability of contracts with minors.[14] Utah, like most states, allows minors to disaffirm contracts before reaching the age of majority or a reasonable time thereafter. Utah Code Ann. § 15-2-2 (1999). As for pornography, S.B. 287, enacted two years ago, requires "publishers and distributors" of pornography to verify age and block the distribution of that material to minors. Utah Code § 78B-3-1001 (2025). And just last year, Utah enacted S.B. 104, the Children's Device Protection Act, which requires all smartphones and tablets to contain a "filter," removable only by a parent or guardian, that prevents the device from "accessing or displaying obscene material through Internet browsers and search engines." *See* Utah Code §§ 76-10-1238(1)(a); 78B-6-2601(2)-(3), 2602.

---

[14] The legislature is well aware of the overlap. At the January 28, 2025 hearing, the sponsor remarked: "I had to chuckle a little bit when one testifier was saying that I was carving out the adult porn sites, ostensibly not realizing that two years ago, this legislature passed my bill that requires age verification for adult porn sites." Himonas Decl. Ex. E-1 at 18:23–19:3. And when responding to a public comment, he noted: "I don't see a problem . . . [the provision] says that a developer can't enforce a contract against a minor. That's already the law." *Id*. at 17:6-9.

In the face of these existing voluntary practices and legislative measures that address each of Utah's purported concerns, S.B. 142 becomes superfluous—and certainly is not a law that is narrowly tailored to advance the government's purported interest while minimizing the impact on protected speech. *See Paxton*, 2025 WL 3754045 at *9 (observing that "only in the vast minority of applications would SB 2420 have a constitutional application to unprotected speech not addressed by other laws"). Because Utah cannot articulate what additional gap it is trying to fill or identify how this statute meaningfully furthers its interest in a targeted way, the State's interest further diminishes while the tailoring issues magnify. *Brown*, 564 U.S. at 803.

### c) *The Act Is Also Woefully Underinclusive.*

S.B. 142 is not just overbroad—it is also so underinclusive as to "raise[] serious doubts about whether the government is in fact pursuing the interest it invokes[.]" *Brown*, 564 U.S. at 802; *see also Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 278 (5th Cir. 2024). Most obviously, the Act targets only *mobile* apps, § 13-76-101(5), and does nothing to prevent minors from accessing the same content or online applications via an ordinary web site—or even on a mobile device via a mobile browser. For example, Instagram and Twitter (both referenced by the Act's sponsor) can be accessed via a mobile app or via internet browsers (www.instagram.com; www.x.com) on both mobile and non-mobile devices; the same is true for countless apps the State may find harmful or not. *See also* Strauser Decl. ¶ 19. The Instagram app and other apps are also available on non-mobile devices such as internet-connected TVs. And, of course, some of the same books, movies, audiobooks, and news content are available for minors to access in physical venues.

Yet these other avenues for accessing the same speech the State finds harmful are entirely unregulated by S.B. 142. The Act requires nothing at all—no age verification; no parental

verification; no parental consent—for minors to access the same or similar services on a website (even a mobile website), via apps on non-mobile surfaces, or in physical stores. Minors can therefore skirt the Act's age verification and parental control requirements by, for example, merely using a web browser on their mobile device, laptop or desktop computer. *See* Strauser Decl. ¶ 18; *accord Paxton*, 2025 WL 3754045 at *7 (law underinclusive because "it cuts teenagers off from the wide swaths of the critical 'democratic forum[] of the Internet' even though the same content offered via apps remains available to minors via pre-downloaded apps like Safari (or in stores)"); *Murrill*, 2025 WL 3634112, at *34 (law was "under-inclusive in that minors (1) can encounter the same potentially harmful content on unregulated websites and (2) can gain more or less unrestricted access to covered platforms upon satisfying the one-time age-verification and parental-consent requirements"); *Carr*, 789 F. Supp. 3d at 1228 (describing "a number of loopholes that reveal [the law's] under-inclusiveness and the disparities in its requirements."); *NetChoice, LLC v. Fitch*, 787 F. Supp. 3d 262, 280 (S.D. Miss. 2025) (same, regarding parental consent requirements). Such obvious underinclusiveness "diminish[es] the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994). It suggests that the State is not actually serious about preventing minors from accessing harmful content, as it leaves them free to access the same speech via different technology. As such, the Act simultaneously burdens speech while leaving a gaping hole that undermines the State's own purported interests. Because the Act is "wildly underinclusive when judged against its asserted justification, [that]. . . is alone enough to defeat it." *Brown*, 564 U.S. at 802.

* * *

In sum, the Act's centerpiece of interlocking verification and consent gates violate the First Amendment and cannot be enforced. While that alone is sufficient to invalidate the entire statute, as discussed below, it is not the only constitutional problem with the Act. S.B. 142 can also be read to require app developers and app stores to replace their existing age-ratings with different state-mandated ones. Under that reading, S.B. 142 adds to its fatal flaws an unconstitutional compelled speech regime.

**B.  The Act's Speech Rating Provisions May Unconstitutionally Compel Speech, and Should Be Construed to Avoid That Result**.

Although S.B. 142's provisions relating to age-rating are difficult to parse, they appear to compel speech in violation of the First Amendment. On the one hand, the Act's definition of "parental consent disclosure" (which is a required part of a "verifiable parental consent") allows app stores to use preexisting (voluntary) age ratings if they have them, and it does not require an age rating for the consent to be valid. § 13-76-101(17)(a). But the Act seemingly undercuts that relaxed approach via its safe harbor provision, which says that "[f]or purposes of setting the age category of an app . . . a developer complies with [the representation in the parental consent disclosure provision] if the developer uses widely adopted industry standards to determine[] the app's age category." § 13-76-402(2)(a)(i). This is potentially a problem because "age category" is defined under the Act as "one of the following categories of individuals based on age:" under 13, 13-15, 16-17, and 18+. § 13-76-101(1). That suggests that developers cannot make use of the safe harbor provision unless they use *the Act*'s age categories, rather than their own. *See* Schruers Decl. ¶¶ 34-40, 47; Strauser ¶¶ Decl. 21-22.

If the Act indeed imposes a requirement that induces developers to replace their existing age categories with the State's preferred age categories, that requirement would create two separate

constitutional problems. First, it would be unconstitutionally vague. The Western District of Texas found as much for Texas's effort to compel app developers to age-rate their apps using the State's preferred categories. *See Paxton*, 2025 WL 3754045 at *8. As with the Texas statute, Utah's S.B. 142 is "silent about what content is appropriate or inappropriate for each age category" and "fails to provide meaningful guidance to developers and stores about what metrics should be used to determine the age rating of an app." *Id.*; *accord StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1253 (10th Cir. 2023) (statute must be declared void for vagueness "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits"). Forcing app developers to rate the speech they provide according to age categories that the statute does not define or explain "interferes with the right of free speech," *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982), because "[w]ithout definitions and standards, the spectrum of interpretations is vast and could lead to selective or disparate enforcement," *Paxton*, 2025 WL 3754045 at *8; *accord Carr*, 789 F. Supp. 3d at 1231 (noting similar issues with age verification requirements).

Second, reading the Act this way would also unconstitutionally compel speech. By making use of the safe harbor contingent on use of the Act's age categories, the Act would hang a Sword of Damocles over app developers' heads: either "speak as the State demands" by using the Act's age rating system, or risk sanctions. *303 Creative*, 600 U.S. at 589. The Act would also trigger strict scrutiny by compelling "speech that a speaker would not otherwise make," *Riley v. Nat'l Fed'n of Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988). The Act would pressure app developers to replace their existing age-ratings, which are based on the voluntary age rating

38

systems used by leading app stores, with new ones based on entirely different age categories mandated by Utah. Schruers Decl. ¶¶ 34, 47; Bye Decl. ¶ 32.

This compelled-speech mandate would not survive any level of First Amendment scrutiny. Utah has no demonstrated interest, much less a "substantial" one, in having the entire universe of mobile apps and app stores conform to its age-rating system. *See Aptive Env't., LLC v. Town of Castle Rock*, 959 F.3d 961, 987 (10th Cir. 2020) (discussing compelled speech requirements under intermediate scrutiny). Google and Apple's age categories are more granular than Utah's, and they create standardized systems for app developers across the country in their respective app stores. The IARC/ESRB rating system, which Google uses to rate and display apps, *see* Bye Decl. ¶ 32, was explicitly referenced by the Supreme Court in *Brown* as "[doing] much to ensure that . . . parents who care about the matter can readily evaluate the games their children bring home." 564 U.S. at 803. Utah has no meaningful interest in arbitrarily replacing existing voluntary age rating systems with government-mandated speech that no better protects or informs the public. *See, e.g*, *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652-53 (7th Cir. 2006) (requirement that video game sellers place age labels on "sexually explicit" video games was unconstitutional compelled speech); *Book People, Inc. v. Wong*, 91 F.4th 318, 338-40 (5th Cir. 2024) (same, for requirement that booksellers issue book ratings).[15]

---

[15] Similar problems would exist if the Act were somehow construed to require app developers to create and provide to app stores new age ratings or content descriptions for *in-app purchases* that they do not currently provide. The best reading of the Act—from both a textual and constitutional perspective—is that S.B. 142 does not require developers to create ratings for in-app purchases or provide them to app stores if they do not currently do so. However, S.B. 142's tortured web of cross-referenced requirements and vague and inconsistent terminology potentially allows the state to infer such an interpretation. *See* §§ 201(2)(b) & 202(4)(b) (holding app stores and developers liable for "knowingly misrepresent[ing] the information in the parental consent disclosure," including content descriptions and age ratings for in-app purchases); § 402(2)(a)(ii) (requiring

The Court can (and should) avoid the lurking vagueness and compelled speech problems by expressly construing S.B. 142 to not require or otherwise incentivize app stores or developers to use the State's age categories. A "cardinal principle" of statutory interpretation is that when a statute raises "a serious doubt as to its constitutionality," courts "will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (quotation omitted). That is certainly possible here, and the only constitutional reading of S.B. 142 is one that allows app developers to provide their own existing age-ratings, and only if they have them. Any creative reading of the statute that would compel new age-ratings for apps or in-app content—whether through the stick of liability or the carrot of a safe harbor—is unconstitutional.

## III. THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION.

### A. CCIA and Its Members Will Suffer Irreparable Harm if S.B. 142 Is Not Enjoined.

Because S.B. 142 violates the First Amendment rights of CCIA and its members, they will suffer irreparable harm without a preliminary injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted); *see also Reyes*, 748 F. Supp. 3d at 1131 ("Because NetChoice has shown it is substantially likely the Act violates social media companies' First Amendment rights, it follows that the balance of equities and the public

---

developers to use "widely adopted industry standards" to determine content description disclosures); § 101(17)(b) (requiring app stores to disclose content descriptions for in-app purchases if in the app store's possession); § 101(7) (defining content description in the context of age-rating criteria). Because that counter-intuitive interpretation would turn the Act into an unconstitutional compelled speech burden, *see Paxton*, 2025 WL 3754045 at *8, constitutional avoidance forecloses it.

interest lean in NetChoice's favor."). CCIA has demonstrated that the Act unconstitutionally deprives CCIA, its app store and developer members, and their adult and minor users, of their First Amendment rights to create, facilitate, and access all manner of protected speech. *See supra* at 17-32.

In addition to the loss of First Amendment freedoms, CCIA and its members will face nonrecoverable compliance costs if S.B. 142 is not enjoined. *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."). Schruers Decl. ¶¶ 43-47; Bye Decl. ¶¶ 37-38, 41, 43; Strauser Decl. ¶¶ 17-18, 22, 26, 28, 31-32. There is no industry standard for age verification, and "every solution has serious privacy, accuracy, or security problems." Schruers Decl. ¶ 45; *see also* Bye Decl. ¶ 38. CCIA's app store members "will spend large, unrecoverable sums up front to develop the proper capabilities[]" to verify a user's age, and even more to develop parental verification procedures or expand existing parental consent infrastructure. Schruers Decl. ¶¶ 45-46; Bye Decl. ¶¶ 38-39, 41-43. Even large app stores like Google will incur "large upfront and ongoing investment of resources to, among other things, evaluate identity, verify documentation, make updates to reflect changing custodial relationships, and address inter-family disputes." Bye Decl. ¶ 39. Additionally, app stores will have to invest significant resources protecting the large amounts of sensitive personal data in accordance with the Act, both in storage and in transit to millions of app developers. *See* § 13-76-201(f)(ii) (imposing data protection requirements); Schruers Decl. ¶¶ 45-46; Bye Decl. ¶ 43.

CCIA's developer members also face unrecoverable compliance costs, all of whom must create and implement a system to ingest app stores' age signals to "verify" a user's age category

and whether parental consent has been obtained. Schruers Decl. ¶ 47. Developers will also incur additional costs in reevaluating their content to re-rate the age appropriateness of their apps according to S.B. 142's age categories, which differ from Google's and Apple's. *Id.* Large content libraries with in-app purchases face particularly large, unrecoverable costs. For example, Audible will be forced to "stand up an entire system built to disclose these so-called ratings," potentially on a state-by-state basis, for its million-plus audiobooks and other audio content. Strauser Decl. ¶ 26. The administrative burdens "would be extremely complicated [and] costly[.]" *Id.*

These burdens are particularly likely to deter small developers of apps that provide access to culture, speech, music, games, health, translation services, and community. Many small developers will not possess the resources to properly accommodate the sensitive age and identification data the Act requires them to ingest. Bye Decl. ¶¶ 43-44. Those developers will either stay and imperil the integrity of the entire system, or they will no longer find it cost-effective to publish an app at all. *See* Schruers Decl. ¶ 48; Bye Decl. ¶¶ 44, 48. This deprives app stores of security, content and revenue, and most importantly, it deprives all users of access to invaluable speech.

CCIA members' users—both adult and minor—are also significantly burdened by the Act. Adults who cannot or will not provide the government identification required will be blocked from accessing all speech provided via mobile apps. So too with minors, who must now depend on their parents possessing the time, ability, and desire to validate their identity and approve every app download and in-app purchase. Relatedly, those same parents have their autonomy wrested from them because they can no longer choose *not* to micromanage their children's online activity. Nor can they opt out of the invasive identification requirements of parental tethering, or avoid the

inevitable deluge of consents once they do tether. These burdens, alone and in combination, deprive individuals of their rights to access protected speech, and deprive app stores and developers from engaging with their users.

The balance of equities and public interest also favor enjoining S.B. 142 because the First Amendment rights of CCIA and its members will be infringed if a preliminary injunction is not granted. Schruers Decl. ¶¶ 49-55; Bye Decl. ¶¶ 9-10, 37-48; Strauser Decl. ¶¶ 13-17, 30. *See also Nken v. Holder*, 556 U.S. 418, 435 (2009) (the final two factors "merge" when, like here, the government is the opposing party); *accord Reyes*, 748 F. Supp. 3d at 1131. Because CCIA has shown a substantial likelihood of success on the merits of its First Amendment claims, an injunction is in the public interest. *Awad v. Ziriax*, 670 F. 3d 1111, 1132 (10th Cir. 2012) ("it is always in the public interest to prevent the violation of a party's constitutional rights") (quotation omitted).

## IV. THE AGE VERIFICATION, PARENTAL VERIFICATION AND PARENTAL CONSENT PROVISIONS CANNOT BE SEVERED FROM THE REST OF S.B. 142.

"The severability of a statute is an issue of state law." *Panhandle E. Pipeline Co. v. State of Okl. ex rel. Comm'rs of the Land Off.*, 83 F.3d 1219, 1229 (10th Cir. 1996). In Utah, severability "is primarily a matter of legislative intent[,] which generally is determined by whether the remaining portions of the act can stand alone and serve a legitimate legislative purpose." *Berry By ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 686 (Utah 1985) (citation omitted). "The test fundamentally is whether the legislature would have passed the statute without the objectionable [i.e., the unconstitutional] part . . . ." *Midvale City Corp. v. Haltom*, 2003 P.3d 334, 346 (Utah 2003) (citation omitted).

While S.B. 142 has a severability clause, too much of the Act is not "operable [to] further[] the legislative purpose" for it to stand. *Utah Vapor Bus. Ass'n Inc. v. State*, 772 F. Supp. 3d 1274 (D. Utah 2025), *appeal filed*, No. 25-4046 (10th Cir. Apr. 24, 2025). As discussed, the centerpiece of S.B. 142 is the interlocking verification and consent scheme. *See supra* at 20-25. Without age verification and parental consent, none of the affirmative obligations placed on app stores and developers (§§ 13-76-201–202), or their enforcement provisions (§ 13-76-401), can function. Similarly, because the age-rating provisions are tethered to the unconstitutional parental disclosure requirement (which is further tethered to the age verification requirement), those provisions requiring content-ratings and descriptions necessarily fall as well. A determination that the age verification and parental consent provisions are unconstitutional means that none of the statute can survive.

## CONCLUSION

CCIA respectfully requests that this Court enjoin Defendants from enforcing S.B. 142 against CCIA members until a final judgment on the merits is rendered.

Dated: February 9, 2026                    Respectfully submitted,

_/s/_     _Deno Himonas_

Deno Himonas
Brian Willen
Lauren Gallo White
Elizabeth Sharkey
Edward Percarpio
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

_Attorneys for Plaintiff Computer &_
_Communications Industry Association_

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on February 9, 2026, the foregoing was filed electronically with the Court's CM/ECF system, which will effectuate service on all counsel of record deemed to have consented to electronic service. All other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing document by email on this day.

*/s/ Deno Himonas*
Deno Himonas